Judgment rendered January 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,528-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
H.W.

* * * * *

Appealed from the
Caddo Parish Juvenile Court
Parish of Caddo, Louisiana
Trial Court No. 165,791

Honorable Don Weir, Judge Pro Tempore

* * * * *

CINC APPELLATE PROJECT
By: The Harville Law Firm, LLC
   By: Douglas Lee Harville

KIMBERLY S. SMITH

CHILD ADVOCACY PROGRAM
By: Reneé Paula Coté
   Dana M. Rausch

Counsel for Appellant,
C.Y., Mother; B.W.,
Presumed Father

Counsel for Appellee,
State of Louisiana, DCFS

Counsel for Appellee,
H.W., Child

* * * * *

Before STONE, ROBINSON, and MARCOTTE, JJ.

**ROBINSON, J.**

In this termination of parental rights matter, both parents appeal a judgment terminating their parental rights and freeing their daughter for adoption.

We affirm the judgment.

### FACTS

On November 21, 2021, a pregnant CY, who was traveling from Kansas, stopped in Shreveport for an emergency C-section. CY gave birth that date to a daughter, HY. After both mother and baby tested positive for amphetamines through a urine test, a report of a drug-affected newborn was received by the Louisiana Department of Children and Family Services ("DCFS") on November 22.

On November 29, 2021, an affidavit in support of an instanter order was submitted by DCFS. CY, who lived in Kansas, had been on her way to bring her 13-year-old daughter to her sister in St. Landry Parish when she had the emergency delivery. CY explained that she had taken her brother's Adderall the prior month. She then stated that her boyfriend, BW, had abused meth around her. Hospital staff expressed concern that CY had left the hospital several times to obtain drugs. CY told the affiant that she had last smoked marijuana two months earlier, and that she had smoked something from a pipe at the end of October. CY was not sure if BW was HY's father. CY was eventually arrested in Opelousas on an outstanding warrant from Kansas for failing to appear.

An emergency instanter order was issued on November 23, 2021. An instanter order followed on November 29. CASA was appointed on behalf of HY on December 2, 2021.

A hearing was held on December 1, 2021. Attorneys were appointed to represent CY, BW, and HY. BW was still believed to be the father at the time. The court found that HY was still in need of care and continued custody was still necessary.

On January 7, 2022, the State of Louisiana filed a petition for adjudication of HY as a child in need of care. The allegations mirrored those in the affidavit in support of the instanter order.

A hearing was held on January 12, 2022, and an adjudication date was set for February 9. HY was in a foster home at the time.

At the adjudication hearing on February 9, 2022, HY was adjudicated a child in need of care as to her mother. CY, who was in jail in Louisiana at the time, suggested to the court that another man, PB, may be the father. The court set an adjudication hearing for the father on March 23. A case plan goal of reunification for CY was approved.

A hearing encompassing a disposition review as to CY and an adjudicating hearing as to the father was held on March 23, 2022. HY was adjudicated a child in need of care as to her father. CY testified that she believed PB was the father even though BW had tried to sign the birth certificate. CY was living in Kansas at the time. The court approved the existing case plan, but modified it to have a dual goal of reunification and guardianship.

A review hearing was held on June 16, 2022. The court heard testimony from Rashona Maxie, a child care specialist with DCFS, as well as from CY. The court approved a singular case plan goal of reunification. The court ordered that CY receive domestic violence counseling as a

principal priority in her case plan. The court found that HY continued to be a child in need of care.

At a hearing on July 14, 2022, it was revealed that DNA testing showed that PB was HY's father. PB testified at the hearing. The court approved a case plan goal of reunification. The court ordered a hair test of the father within the next week. The court also ordered a home study of him.

A permanency and case review hearing was held on November 17, 2022. The court heard testimony from Maxie and from Chad Stewart, a child protection specialist with the Kansas Department of Family and Children ("DFC"). The court approved a case plan goal of adoption, although that did not preclude reunification or DCFS's obligation to work with the parents to achieve reunification. HY was continued in custody.

A preconference hearing was held on December 1, 2022. The court ordered that its disposition, case, and jurisdiction were deemed subordinate to a Kansas court having subject matter jurisdiction over child abuse and neglect. DCFS was to surrender jurisdiction and physical custody of HY upon a request from DFC.

On December 2, 2022, DCFS filed a motion for reconsideration. DCFS maintained that DFC intended to bring a child in need of care proceeding there. DCFS further maintained that bringing a new action in Kansas would delay permanency for HY, and that the Louisiana court was in a superior position to make future rulings. DCFS asked the court to reconsider and recall its December 1, 2022, orders and to maintain jurisdiction as it was in the best interest of HY, including her need for permanency.

3

A hearing on the motion for reconsideration was held on December 5, 2022. The court heard testimony from Maxie, CASA supervisor Larry Brown, the foster parents, and Janet Barnes, the Assistant Regional Director of Programs at DFC. The court granted the motion to reconsider. The December 1 order was modified to state that the court's judgment and disposition would not be subordinate to other jurisdictions.

The child in need of care proceeding had been filed under docket number 165791 with the caption "State of Louisiana in the Interest of [HW]." On March 7, 2023, and under a new docket number of 168396, the State filed a petition for involuntary termination of CY's and PB's parental rights. The petition had the caption, "State of Louisiana in the Interest of [HY]." The alleged grounds for termination were La. Ch. C. arts. 1015(5)(b) and (c) and 1015(6).

*Termination hearing*

The termination hearing was held on July 6, 2023. The court heard testimony from the parents, the foster mother, the foster grandmother, and PB's father. The court found that there was a lack of substantial compliance with the case plan and no reasonable expectation of significant improvement in the parents' condition or conduct in the near future. Accordingly, the court ruled that the State had proved its case, that the parental rights of CY and PB should be terminated, and that HY was freed for adoption.

On July 24, 2023, the court rendered a judgment terminating the parental rights of CY and PB pursuant to La. Ch. C. arts. 1015(5)(b) and (c) and 1015(6). HY was certified freed for adoption. The docket number on the judgment was 168396.

4

*Reasons for judgment*

The trial court provided extensive written findings of fact and reasons for judgment in which it summarized the witnesses' testimony.

PB was 30 years old, and he learned that HY was in foster care in March of 2021. PB has ten children, all of whom live primarily with their mothers. He has no direct custody of any of his children.

When PB was asked what he needed to do under his case plan, he stated that he needed to keep a job, stay in contact, get a home study completed, pay his child support, maintain suitable housing, and submit to drug screens. He acknowledged that he had not completed his case plan.

PB testified that he was working on paying back child support for his children in Kansas. He has paid no child support to HY's foster parents. He lived in four different places in 2022 and 2023. He claimed that he completed a parenting class at a church, but could not recall the name of the church.

He explained that he missed a drug screen on May 8 because he had to immediately return to Wichita to seek medical treatment for an older daughter who had broken her arm. He also testified that he was told that his hair follicle tests were insufficient or appeared altered.

PB denied a history of drug use, but later testified that he was convicted of methamphetamine possession in 2012. He also later testified that that conviction was from 2018. PB claimed that his probation for that conviction was revoked when he left Kansas without permission to attend a relative's funeral. He was released from prison on January 5, 2021. When he was asked if he had completed a substance abuse relapse prevention program, his response indicated it was more than once.

5

The court found PB's testimony to be entirely lacking in credibility. The court also reiterated that none of PB's ten children were in his custody, he lived in four different places in the last two years, he made zero contributions to the foster parents, and he participated in around only 50% of the scheduled video visitations with HY.

Given PB's admissions, the court found that he exhibited a pattern of behavior which led to the inescapable conclusion that there was absolutely no reasonable expectation of significant improvement in his conduct in the future or at any time.

The court found the evidence just as damaging for CY. She has four other children besides HY. They live in Kansas, and she has custody of none of them. When CY was asked to explain why HY was removed from her care, she testified that as she was changing HY before they were discharged, HY's tag fell off, and the hospital staff "freak[ed] out" about putting the tag back on. She disputed that HY tested positive for drugs. When she was later asked if she understood why HY was in foster care, she answered that it depended on who was asked and when you asked them. Then when she was asked why her kids in Kansas were in foster care, she replied that she did not feel comfortable answering that question. She added that DFC did what it wanted.

CY denied to the court that she had any substance abuse issues despite admitting to drug use. She has used marijuana, Xanax, Percocet, morphine, cocaine, and methamphetamine. The most recent methamphetamine use was in March of 2022. When asked if she had ever used ecstasy, she denied it and said she felt like it was none of the attorney's business. She was

6

surprised that she listed ecstasy use on her self-assessment at Recovery Unlimited, a drug treatment program.

She testified that she had tested positive for amphetamines on one drug screen since HY has been in foster care. She also testified that when her kids in Kansas were removed in December, she had a positive hair follicle test for amphetamine. She did not submit to two opportunities for drug testing on May 8, 2023. She was kicked out of treatment at Recovery Unlimited because she missed a day.

CY claimed that she did not know until May that she was supposed to contribute to HY's care. Nevertheless, she has made no contributions to her care. She attended a few parenting classes with the Mental Health Association of Kansas, but felt they wanted too much from her while providing too little. She signed up for another parenting class but never started because she lost her car.

CY testified that it would not surprise her if DFC said that she was not doing what she needed to do there, and that they had trouble with drug screens for her. She claimed that she provided DCFS with proof that she had completed some portion of her case plan regarding the parenting class. She also said that she had complied with drug treatment until she was kicked out. She was not sure if she sent reports of the status of her case completion in Kansas to DCFS.

CY thought it was in HY's best interest to be returned to her. She considered herself to be a great mother. Although she thought drug use was relevant to the determination of whether someone should be allowed to keep their child, she added that she does not think it determines that someone is

7

incapable of keeping a child because addiction is something that people cannot get rid of whenever it is a real problem.

HY's foster mother testified that CY made only 8 of 14 recent video visitations. She also testified that PB's participation was about the same. She noted that neither one tried calling her to reschedule any missed video visits. CY acknowledged not making all video visits with HY, but claimed that the foster parents did not answer her visitation calls for four weeks in a row.

The court reflected that there should be no expectation of reformation or any likelihood of reformation when a parent shows a long history of drug abuse while continuing to deny a drug problem. In addition, the failure to cooperate with authorities in addressing a child's needs also suggests that no reasonable expectation of reformation exists, and that it is unlikely that the parents will reform. Finally, reformation of a parent in the context of a parental rights termination means more than mere cooperation with agency authorities. A showing of significant indication of reformation is required.

The court considered that between CY and PB, they have 14 children and have custody of none. The court believed it would be unfathomable to think it would be in HY's best interest to be in the custody of either parent.

The court characterized CY and PB as living in "an alternate reality of mendacity and denial, never taking responsibility for their shortcomings as parents." The court found: (1) they both failed to complete their case plans; (2) they both failed to financially contribute to HY's care; (3) they both consistently failed to make video visits with HY; and (4) they both have serious drug issues notwithstanding their testimony to the contrary. The

court did not think it would be logical to expect them to reform their patterns of conduct without facing their addictions.

*Appeal*

On August 3, 2023, CY and BW[1] filed a motion for suspensive appeal under docket number 165791, which is the child in need of care proceeding. The motion states it is for all errors to be assigned concerning the termination of parental rights and all other matters heard on July 6, 2023.

## DISCUSSION

CY and PB argue on appeal that the court erred or was manifestly erroneous in terminating their parental rights because DCFS failed to prove by clear and convincing evidence that: (1) CY and/or PB had not substantially complied with their case plans; (2) there was no reasonable likelihood of compliance in the near future and that DCFS had engaged in reasonable efforts to reunify HY with CY and/or PB; (3) there was a six-month consecutive failure by CY and/or PB to provide parental contributions that was not based on poverty and/or DCFS' failure to offer reasonable services to them; (4) CY and/or PB did not communicate with HY for any period of six consecutive months when they knew HY was in DCFS custody; and (5) it was in HY's best interest to terminate the parental rights of CY and/or PB.

The State contends that the court lacks jurisdiction to review the termination judgment because the appeal was actually taken from the judgment in the child in need of care proceeding.

---

[1] Naming BW as an appellant was in error. Although there was speculation initially that BW may be the father, PB was proven to be the father.

*Jurisdiction over this appeal*

The State argues that this Court lacks jurisdiction because, while a timely motion to appeal was filed under the child in need of care proceeding, which was docket number 165791, no motion to appeal was filed under the suit for the parental rights termination, which was docket number 168396. Therefore, the State contends the judgment in the parental rights termination case became final and unassailable.

Appellate counsel's confusion over docket numbers is understandable. The State points out in its brief that by local rule, terminations of parental rights proceedings and child in need of care proceedings are filed under separate docket numbers and maintained in separate suit records. We note that while the termination judgment has docket number 168396, the written reasons for judgment lists docket numbers 165791 and 168396. That was because upon terminating the parental rights, the court then conducted a brief permanency hearing. Although the written reasons were filed after the motion for appeal, we mention it to illustrate the potential confusion. We also note a July 31, 2023, email in the record from the State's attorney which stated that the minutes show that the termination under docket number 168396 was rendered in error under docket number 165791 in the child in need of care proceeding. She added that "it gets confusing for everyone since they have different docket numbers."

Based upon the lack of any demonstrated prejudice to any party, the clear intention of the parents to appeal the termination judgment, and most importantly, what is at stake for the parents, we conclude that under these circumstances, the appeal is maintained.

*Merits of the appeal*

The termination of parental rights involves a two-pronged inquiry. First, the State must establish the existence of at least one ground for termination under La. Ch. Code art. 1015. If a ground for termination is found, then the trial court must determine whether the termination is in the best interest of the child. *State in Interest of C.F.*, 17-1054 (La. 12/6/17), 235 So. 3d 1066.

The termination of parental rights is a severe and terminal action. *State ex rel. B.H. v. A.H.*, 42,864 (La. App. 2 Cir. 10/24/07), 968 So. 2d 881. Parents have a natural, fundamental liberty interest to the continuing companionship, care, custody, and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. *State ex rel. D.L.R.*, 08-1541 (La. 12/12/08), 998 So. 2d 681; *State ex rel. K.G.*, 02-2886 (La. 3/18/03), 841 So. 2d 759. In a termination of parental rights case, the interests of the parent must be balanced against the child's interest, but the child's interest is paramount. *State in Interest of C.F.*, *supra*.

As noted earlier, the grounds for termination listed in the petition were La. Ch. C. arts. 1015(5)(b) and (c) and 1015(6). The judgment also stated that termination was pursuant to the above provisions. Article 1015 was amended by Act 271 of 2023, which had an effective date of June 9, 2023. Act 271 renumbered art. 1015, such that subparagraph (5) is now subparagraph (4), and subparagraph (6) is now subparagraph (5). Thus, at the time of the July 2023 termination hearing, La. Ch. C. art. 1015 stated, in relevant part:

11

The grounds for termination of parental rights are:

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
. . . . .
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

The petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence. La. Ch. C. art. 1035(A).

The parents initially argue that this Court should apply a *de novo* review because the trial court did not consider all relevant legal standards. We find no merit in this argument. An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the manifest error standard. *State ex rel. K.G.*, *supra*.

We first turn to the parents' argument that the court erred or was manifestly erroneous when it terminated their rights because DCFS failed to show by clear and convincing evidence that (1) any 6-month consecutive failure by CY and/or PB to provide parental contributions was not based on

poverty and/or DCFS' failure to offer reasonable services to them, and (2) CY and/or PB failed to communicate with HY for any period of six consecutive months when they knew HY was in DCFS custody.

Those are grounds for termination under art. 1015(4)(b) and (c). There is a separate ground for termination in art. 1015(5), which is that there was no substantial parental compliance with a case plan and despite earlier intervention, no reasonable expectation of significant improvement in the parent's condition or conduct in the near future. That was the basis for the trial court's decision to terminate their parental rights.

As noted below, the failure to contribute to the costs of the child's foster care and the failure to communicate with the child can be evidence of lack of parental compliance with the case plan.

In its written reasons for judgment, the trial court referred to the following provisions in La. Ch. C. art. 1036(C) and (D):

> C. Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:
> . . . . .
> (2) The parent's failure to communicate with the child.
> . . . . .
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
> . . . . .
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.
> (8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.
>
> D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or

13

incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

. . . . .

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

We also note that when ruling from the bench, the court stated that it can "terminate parental rights when there's been a lack of substantial parental compliance with the case plan and when there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future. I find those to exist, those two factors in Article 1015(5)."

The parents argue that DCFS did not establish by clear and convincing evidence that either one of them was not in compliance with their case plans, or that any failure to do so was due to their intention to disobey their case plans or abandon HY and their parental obligations to her.

The parents maintain that they testified about their efforts to comply with the case plan despite the economic hardships they faced. They further maintain they attended required programs and attempted to make support payments in spite of their financial difficulties and housing instability. The parents emphasize on appeal that no DCFS caseworker, social worker, supervisor, or contractor testified at trial, nor was there testimony from any expert or medical provider.

In summary, the parents contend that their testimony established that they complied with and were trying to comply with their case plans and that they wanted to regain custody of their daughter.

The parents further argue that DCFS failed to show by clear and convincing evidence that there was no reasonable likelihood of compliance

14

in the near future and that DCFS had engaged in reasonable efforts to reunify them with HY. They contend that DCFS presented no evidence it made any efforts, much less reasonable efforts, to assist them in removing any obstacles to reunification. They argue that the failure to offer evidence or testimony from DCFS personnel precluded the State from meeting its substantial burden. In support of its argument, the parents cite the following language from *State ex rel. A.T.*, 06-0501, pp. 9-10 (La. 7/6/06), 936 So. 2d 79, 85:

> Unlike the other grounds listed in La. Ch. C. art. 1015, termination under La. Ch. C. art. 1015(5) may only be ordered "after affirmative efforts have been attempted by the state to reunite the family by providing rehabilitative services, if needed, to the parent." Lucy S. McGough and Kerry Triche, *Louisiana Children's Code Handbook*, p. 522 (2006).

PB testified that he did not know HY was in foster care until CY was released from jail. He is 30 years old and has ten other children who primarily live with their mothers. His oldest child is 13. There are no formal custody orders for any of his children. He and CY were expecting another child.

PB testified that once he found out that he was a father, he contacted DCFS and inquired about what needed to be done in order to bring HY home. He acknowledged receiving a case plan, and that there were specific things expected of him. He understood that his case plan required him to make contributions to HY's care, maintain a stable place to live, and submit to drug screens.

PB, who works as an independent contractor, was paying back child support for his other kids at the time of trial. He was supposed to contribute $25 a month for HY's care but never made any of the payments. At first, he

expressed that he wanted to contribute to HY's care, but did not know how to make the payments. He stated that nonpayment was not because he was unable to make contributions. However, he later explained that only recently was he able to get back on his feet, he had other kids and a lot happening, and money was tight. His monthly gross income is $2,200 to $2,500.

PB lived in four different places over the past two years. After his house caught on fire in August of 2022, he moved in with his father. He later moved to another residence, and then on May 1, 2023, he moved into his current residence, which is an apartment in Wichita with two bedrooms and two baths. A home study has been requested since July of 2022.

He denied a history of drug use, and said he was unaware if CY had a history of drug use. He also denied that CY's kids in Kansas were taken into custody because of her drug use. His understanding of how HY came into foster care is there was a false test scenario.

PB stated that he last used illegal drugs when he was 18 or 19. At first, PB testified that he pled no contest to possession of paraphernalia in 2012 after being originally charged with possession of methamphetamine. He described his drug charge as him being in the wrong place at the wrong time, and he was not using meth when he was arrested. Later, he claimed he was convicted of possession of opiates in 2018, so he was wrong about it happening in 2012. His probation was revoked when he left Kansas without permission to attend a relative's funeral. He was released from prison on January 5, 2021.

PB claimed that nobody with DCFS explained why it wanted to drug test him. He stated that DCFS first asked for a drug test in July of 2022. He

testified that he did a hair follicle test for DCFS, but was told the test looked insufficient or altered. He missed two drug screen appointments in Louisiana on May 8, 2023. He explained that he missed the first one when he overslept. Then while visiting HY, he learned that he had to return to Kansas immediately to authorize medical treatment for an older daughter who had broken her arm. PB claimed that he has submitted to drug tests that he arranged himself on the 10th of every month since January of 2022, but has not provided the results to DCFS because he is waiting on them. His most recent tests were on May 10 and June 10.

He and CY began doing the video visits together after he had phone problems. The video visits are twice a week for 15 minutes. He missed two visits in the last month because of work, and he explained that to DCFS. He obtained a new cell phone that week. Prior to that, he was without one for two to three months. He has seen HY in person three times.

PB testified that he maintained contact with his former caseworker, Maxie. He has not maintained as much contact with his current caseworker, Moore, because of phone issues. PB acknowledged that he has not completed his case plan. He claimed that DCFS has not let him know what he has remaining on his case plan, but he believed that he has done everything on his case plan except for his home study. He asked the court for additional time to complete his case plan.

PB testified that he completed a domestic violence counseling treatment plan, even though he was unaware it was part of his case plan until recently. It was a one-day class in Wichita. He also testified about completing a substance abuse relapse prevention program three months earlier. It was once a week for 20 weeks, and he did it with CY to help her.

17

He went even though he denied drug issues because he wanted to cover all his bases in getting HY back. PB testified that he completed a parenting class, but he could not remember the name of the church where he took it. It was once a week for 12 weeks, and he believed that he sent the certificate to his case worker.

PB also testified that he was provided with certificates when he completed the domestic violence counseling treatment program and the substance abuse relapse prevention program. He added that he sent the certificates to Maxie, but then stated that if he had not sent them yet or if they had not received them, it was because he lacked an adequate phone. He did not bring the certificates to court because he already gave them to his attorney and was unaware that he needed to bring them to court.

CY, who is 32, has four other children besides HY. Her daughters are 8 and 14, and her sons are 9 and 13. Her kids in Kansas were removed from her care by DFC and are with their grandmother. She was due to give birth again on October 1.

When CY was questioned about her understanding of what happened when HY was removed, she said that when they were getting ready to be discharged from the hospital, a tag fell while she was changing HY, and they came in "freaking out about put the tag back on." She was then told that they did not know if HY could leave with her, but nobody could tell her why. She added that two days after she left the hospital, Jasmine McDuffy with DCFS called her and said HY had tested positive for drugs.

Not long thereafter, she called the police to report that BW had stolen her car, but she ended up being arrested for a warrant out of Kansas. She participated by video for a hearing in January of 2022. She was released

from jail in Louisiana on February 19, 2022. After she was released from jail, she went to her sister's home in Melville, Louisiana, for a few days before returning to Shreveport and trying to visit HY, but was told that she could not see HY. She stayed in Louisiana for five to six days before going back to Kansas.

Around three weeks later, she returned to her sister's home in Melville for five days. She claimed that she did not visit with DCFS during those five days because McDuffy did not return her phone calls until the end of March. CY claimed she was not given the opportunity to visit HY when she stayed with her sister those five days.

CY testified that she received her case plan when Maxie became her caseworker in May of 2022. She acknowledged that when HY was adjudicated a child in need of care, which happened on February 9, 2022, it was explained to her that certain things were going to be asked of her, and that those things were going to be in a case plan.

CY testified that she has lived on and off with her brother in his house for the past three or four years. His home has four bedrooms, and he lives there with his girlfriend. She claimed that she had gotten a house in November or December of 2022, but was scammed. She stayed with her grandmother for a few weeks in January of 2023 after her kids were removed. There were a few periods when she was homeless; during those times, she most often stayed in hotel rooms, or with friends. She was homeless for two weeks during the summer of 2023, then after school started in August, she lived in a hotel for two months. CY acknowledged that during the times that she was homeless, she could have returned to her brother's home, but she wanted to be in her own space with her kids.

19

CY testified that until May of 2022, she was unaware that she was supposed to make contributions to HY's care. She has made no contributions. In the past, she has delivered newspapers, and worked at Hallen Solutions and at a Wendy's. At the time of trial, she was employed as a virtual assistant, but it was not a fulltime job. She would get a side job whenever she needed money.

CY has seen HY twice in person since her birth, with those visits occurring at the end of January and on May 8, 2023. Video visits started in May of 2022. She has not made all video visits because she was working a couple of times, and sometimes the foster parents did not answer the phone. She claimed that in the fall of 2022, there was a four-week period when the foster parents did not answer the phone. On one occasion she called the original foster parents by mistake. She was not able to have three video visits recently because the foster parents had lost power.

CY testified that it was part of her case plan to submit to a substance abuse assessment and obtain treatment if recommended, submit to a mental health evaluation and obtain treatment if recommended, obtain safe and stable housing, and participate in visitations. She claimed that when she received her case plan was the first time that she learned that she could visit HY.

CY testified that submission to random drug screens was not originally a part of her case plan, and that she was not asked to submit to random drug screens until the last time that she was in court.

CY denied having any substance abuse issues. She thought she voluntarily submitted to drug screens at Recovery Unlimited, and had tested positive for amphetamines and possibly marijuana. She claimed that after

20

she was tested a couple of weeks before her kids were removed in Kansas, DFC workers told the Louisiana court that her hair test was positive even though her urine screen was clean. CY expressed disbelief that her test was positive because she had last used drugs in March of 2022. She maintained that DFC lied to the court and to DCFS about her sobriety.

CY maintained that while she has used drugs in the past, in her opinion, she has never had a drug problem. She first smoked marijuana at the age of 14, and last smoked it in March of 2022. When asked if she had ever used ecstasy, she said she felt like she should say it was none of the attorney's business, and then said no. She did not remember putting down that she had used ecstasy on her self-assessment at Recovery Unlimited. She first used Xanax when a freshman or sophomore, and last used it in her teenage years. She also admitted to using Percocet and morphine. She last used cocaine seven to eight years ago. She last used methamphetamine in March of 2022. She denied using meth when she was pregnant with HY, but first used it in 2021 prior to HY's conception. She said she was never a meth user.

CY acknowledged that she was kicked out of Recovery Unlimited after missing two days and then being late on a third day. She explained she missed one of those days after she lost her car. She did not complete treatment at Recovery Unlimited.

CY testified that when DFC became involved with her family in Kansas in December of 2022, methamphetamine was not spoken about as a problem for her. She acknowledged that she had two opportunities to submit to a drug screen in Louisiana on May 8, 2023. She slept through the first appointment that day because she and PB had driven to Louisiana overnight.

21

Asked why she did not submit to the second drug screen even though the judge had ordered it, she replied that she could either leave with PB or be left behind. In addition, at that time, she had not seen her kids in Kansas for a week.

CY testified that she was told in Kansas that she needed to undergo a clinical assessment and take parenting, budget, and nutrition classes, but she has never received a formal case plan there.

It would not surprise CY if DFC said she was not doing what she needed in Kansas because they had just gotten ahold of her the last week. It also would not surprise her if DFC said it had problems with drug screens from her. DFC has not asked her for a drug screen except for when they were in Louisiana and she missed court in Kansas because their car had broken down.

According to CY, she went to a few parenting classes with the Mental Health Association of Kansas in the beginning of 2022, but "it was too much that they wanted from me and too little that they were doing for me." She tried to do another parenting class online, but Maxie told her that it would not count. She signed up for another parenting class, but never started it because she lost her car. She did an online parenting class in the beginning of 2023. CY stated that she sent proof to Maxie in February of 2023 that she had completed the second online parenting class.

CY testified that she completed a parenting class with a sexual abuse recovery center in Wichita in January or February of 2023. She also stated that she completed a domestic violence counseling treatment plan in Kansas. She added that she completed a substance abuse relapse prevention program through First Step Forward Recovery Counseling in January or March of

22

2023.  She received certificates for all three programs.  She had two modules left in a budget and nutrition program.

CY claimed that she set up mental health counseling with a counselor who she assumed performed a mental health assessment.  She had scheduled one earlier, in September of 2022, but had stopped it because she thought the lady was weird.  She had a clinical assessment scheduled in Kansas, and she thought it could be done over the phone.

CY contended that she tried to work with DFC before her kids were removed.  She had sought out DFC's family preservation services at the beginning of the year and was told that she did not need to do it because she was already doing everything.

When CY was asked if she understood why HY was in foster care, she replied that it depended on whom you asked and when you asked them, and she got something different.  Asked if she disagreed with the whole thing, she replied that she did not have anything solid to agree or disagree with.  Asked if she understood why her kids in Kansas were in custody, she replied that she did not feel comfortable answering because it was going to get a little testy.  She then added that DFC did what it wanted.

When CY was questioned about providing proof to DCFS that she had completed any portion of her case plan, she replied that she sent something about her parenting class at the beginning of 2023, she complied with drug treatment until she was kicked out, she did not remember about proof of stable housing, and she has not paid for HY's care.

CY testified that she spoke with Moore a couple of times about the status of her case plan completion in Kansas.  She claimed that Moore told her that DFC was saying that she had completed nothing on her case plan, so

23

she told Moore what she had done there, and Moore asked her to send copies of what she had done. Questioned about whether she sent the reports to Moore, CY replied that she was unsure. She gave an unclear response when asked if she brought the certificates to court. CY testified that she told Maxie that she had completed her substance abuse treatment program. When Maxie told her that she had not done it yet, she told Maxie that she did not understand because she sent the certificate to Maxie several times. CY believed that either Maxie or Moore knew she completed the protective parenting program.

CY testified that it was her intention to complete the case plan in order to address the issues that caused the initial removal. She was trying to do that in Kansas to the best of her ability. She thought being in Kansas made it difficult to comply with her case plan in Louisiana.

She believed it would be in HY's best interest to be returned to her. When questioned by the court about why she believed that, she replied: "I don't believe that she should have been removed from me to begin with. I don't believe that Louisiana has more ability to determine what's best for her than I do. I've got a handful of reasons. I don't know which ones you really would want to hear." She considered herself a great mom because she had great kids.

When CY was asked by the court if she thought that drug use is relevant to the question of whether someone should be allowed to keep their child, she answered: "I think, yes, it should and could be a factor. I also think that it doesn't determine that somebody is incapable of keeping a child because addiction is definitely a thing that people can't get rid of whenever it's a real problem. And people also take prescription medication way worse

24

in some instances." Asked by the court if that was a yes or no, she replied that it was both.

The basic obligations under the case plan given in May of 2022 were: (1) maintain safe housing adequate to meet their child's basic needs; (2) pay $25 per month in parent contributions by money orders that were to be mailed; and (3) maintain regular contact with the child while in foster care in accordance with the visitation plan.

PB and CY failed to meet even these basic obligations. Their housing was scattershot and unreliable. PB lived in four places in two years. CY chose to live in hotels at times instead of with her brother.

In support of their argument addressed earlier that the State failed to establish any consecutive six-month failure by either of them to provide parental contributions, the parents cite a footnote from *State ex rel. A.T.*, *supra*, where the Supreme Court stated that poverty, and thus lack of support, cannot be the sole reason for terminating parental rights; rather, there must be willful neglect in the failure of a parent to support his or her children. While that statement was in reference to La. Ch. C. art. 1015(4)(b), where an intention to permanently avoid parental responsibility can be demonstrated by the parent failing to provide significant contributions to the child's care and support for any period of six consecutive months, we understand the policy behind the Supreme Court's statement.

However, it was not poverty, but drug use, that led to the removal, and it is drug use which remains the primary impediment to reunification. In particular, we note CY's refusal to admit that she has a drug problem and the

25

impact it has on raising children.  PB was also not forthright about CY's drug problem.

The parents also argue that keeping jurisdiction in Louisiana placed a significant burden on reunification efforts through visitation.  While we recognize the impact distance would have on in-person visits, we also note the failure of CY and PB to take full advantage of video visits.

Those video visits were scheduled for 5:00 p.m. on Tuesdays and Fridays.  They lasted 15 minutes.  MS, the foster mother, testified that since the last court date in May, CY attended 8 of 14 video visits.  PB is usually on the visits when CY calls, so his participation rate was around the same. Before May, they were participating in about 75% of video visits.  MS could not recall times when she found out that CY had unsuccessfully tried to reach her.

MS testified that she may have missed one call because they were at the hospital, but other than that, she had her phone alarm set for 4:55 p.m. every Tuesday and Friday.  MS stated that CY and PB were not taking advantage of every opportunity for video visits, and they never tried to reschedule when they had to miss.   She added that her cell phone worked when they had no power in June of 2023, and while service was spotty then, she did not have a missed call.

CY and PB complain about the lack of testimony from DCFS witnesses.  However, we note that the trial court took judicial notice of the judgments from the child in need of care proceeding.  The judgment from the hearing on February 9, 2022, states that the court found that DCFS has made reasonable efforts to prevent removal and to reunify the family, with the efforts including timely preparing and furnishing an individualized case

26

plan in clear language that identifies specific tasks which if completed are reasonably calculated to permit reunification of the family. This same language was repeated in the judgments from the hearings on June 16, 2022, and November 17, 2022.

This Court is not only disturbed by the parents' attitudes about drug use, but it is also disturbed by their lack of responsibility, which is best evidenced by their relationships with their other children. PB has ten other children, and he effectively has custody of none, regardless of the absence of any formal custody decrees. CY has four other children, and all were removed from her custody. PB and CY were expecting another child at the time of trial.

CY's and PB's established patterns of behavior concerning both drug use as well as their lifestyles in general demonstrated there is no reasonable expectation of significant improvement in CY's or PB's condition or conduct in the near future.

The State presented clear and convincing evidence of the La. Ch. C. art. 1015(5) ground for termination.

*Best interest*

The parents argue that the testimony from the foster mother and her mother was insufficient to meet the State's high burden of proving that termination of her parents' rights was in the best interest of HY. We disagree.

MS and her husband were a respite placement initially. HY has been living with her family on a fulltime basis since October of 2022. She described HY as doing great. HY has bonded with their family, and it is

27

their desire to adopt HY. MS's mother, LU, testified that HY is happy, content, and well-adjusted.

HY has been in foster care for basically her entire life. It is the only life that she knows. She is entitled to a family setting that is permanent and which meets her physical and emotional needs. The State presented clear and convincing evidence that terminating CY's and PB's parental rights was in HY's best interest.

Based on the evidence presented, we conclude that the trial court was not manifestly erroneous in terminating CY's and PB's parental rights and freeing HY for adoption.

## CONCLUSION

The judgment terminating CY's and PB's parental rights and freeing HY for adoption is AFFIRMED. Costs of this appeal are assessed to CY and PB, with each to pay one-half of the appeal costs.